1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                       FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  SEAN NICHOLAS COYLE,                     No.  2:11-cv-0016 MCE CKD P

12                Petitioner,

13       v.                                  FINDINGS AND RECOMMENDATIONS

14  M. McDONALD, WARDEN,

15                Respondents.

16

17          Petitioner is a California prisoner proceeding pro se with a petition for writ of habeas

18  corpus under 28 U.S.C. § 2254.  Petitioner is serving a life sentence for murder.  On appeal, the

19  California Court of Appeal for the Third District affirmed his murder conviction.  Petitioner

20  challenges his conviction, arguing the trial court erred by failing to grant his motion for a mistrial

21  on two grounds: (a) the courtroom facilities were inherently prejudicial because they left jurors

22  with the impression petitioner was in custody, and (b) Juror Number 11 was actually biased.

23  I.  Background

24          Petitioner Coyle killed a drug dealer named Samuel Trujillo, and a jury convicted him of

25  murder.  On appeal, his conviction was affirmed in part and reversed in part by the California

26  Court of Appeal for the Third District in a partially published opinion.  His judgment of

27  conviction for count I—murder during the commission of a robbery—was affirmed, and all other

28  counts of his conviction were reversed and vacated.  People v. Coyle, 178 Cal. App. 4th 209, 220

1

1   (2009) (Cantil–Sakauye, J.).  The factual background of Coyle's underlying conviction are set out

2   in detail in the published portion of the Court of Appeal's opinion, id. at 247-50, and need not be

3   recounted here.

4         In the unpublished portion of its opinion, the Court of Appeal affirmed the trial court's

5   denial of Coyle's motion for a mistrial on the grounds of juror misconduct.  People v. Coyle,

6   C058218, at *12-22 (Cal. Ct. App. Oct. 13, 2009) (ECF No. 31, Lodged Doc. No. 5).  Coyle's

7   petition for habeas relief asserts juror misconduct at his criminal trial; thus, the following factual

8   background is drawn from the transcript of his trial.  First, these findings and recommendations

9   provide the factual context for petitioner's argument that the Cameron Park courthouse facilities

10  prejudicially left jurors with the impression he was in custody.  Second, these findings and

11  recommendations provide the factual background concerning petitioner's claim that Juror

12  Number 11 was actually biased.

13        A.  The Prejudicial Effect of the Courtroom

14        The first day of petitioner's trial was conducted at the main courthouse in Placerville;

15  however, the following four days were held at a branch courthouse in Cameron Park.  Petitioner

16  contends the circumstances at the branch courthouse in Cameron Park left the jurors with the

17  impression he was in custody.  The Cameron Park branch courthouse is not often used for major

18  criminal trials, so the courthouse lacked facilities to house Coyle during recesses.  Thus, Coyle

19  was detained in the courtroom during lunch breaks, and, at those times, the jurors were excluded

20  from the courtroom.  Moreover, during the trial, officers remained in the courtroom with

21  handcuffs visible nearby, and Coyle was brought into the courtroom through the back, rather than

22  through the usual entrance.

23        The trial court became concerned about juror misconduct on the second day of trial, when

24  a juror expressed that she may recognize the defendant.  On Thursday August 30, 2007, after a

25  brief recess, Alternative Juror Number 1 ("AJN 1") discussed her concern with the judge.  The

26  discussion also revealed several jurors had been discussing Coyle's in-custody status:

27              THE COURT: . . .  We're in session out of the presence of the jury.
                Apparently, one of our jurors had a memory sparked about this
28              situation.

2

. . . .

ALTERNATE JUROR NO. 1 . . . : I apologize.  Yesterday afternoon when you called me into the jury box, I had a better opportunity to observe [Coyle] and his mannerisms, and when I was driving home, I had a nagging feeling, but I kind of slept on it. When I arrived this morning, I was going to approach the bench, but I didn't because a couple of other jurors had indicated that he had been incarcerated since 2003, so I thought I was mistaken. Now, my concern is, is that true or has he just recently been incarcerated?

THE COURT: Okay.  What significance would that have one way or the other?

ALTERNATE JUROR NO. 1 . . . : Well, as you know I work in an emergency room, and if [Coyle] has only recently been incarcerated, then I have spoken to him at least on two occasions in the emergency room in Roseville.

(Rep.'s Tr. on Appeal ("R.T.") 65:16-66:17, ECF No. 31, Lodged Doc. No. 10 (emphasis added).)  AJN 1 was returned to the jury room, and the judge noted the problematic nature of AJN 1's statements: "The problems that I see are that the jurors are discussing [Coyle's] custodial status and so I'm not sure exactly how we address that; the second issue being how do we indicate to [AJN 1] that it's probably not the Defendant that she has had contact with without confirming that custodial status."  (R.T. 66:27-67:4.)

Coyle's defense attorney suggested the court "inquire and find out who these jurors are that are confirming [Coyle's ] custodial status and determine whether the jury is now too tainted to be able to proceed."  (R.T. 67:18-22.)  The court agreed and recalled AJN 1 to ask her who told her that Coyle was in custody.  AJN 1 identified Juror Number 3 ("JN 3") and Juror Number 6 ("JN 6") as the two jurors who told AJN 1 that Coyle had been in custody since 2003.  The judge then asked JN 6 separately what the source of his information was:

THE COURT: . . .  What would the source of your information be?

JUROR NO. 6 . . . : I don't have a source.

. . . .

THE COURT: You've just kind've suspected that [Coyle] might have been incarcerated [since 2003]?

JUROR NO. 6 . . . : Yes.  Yes.

3

THE COURT: You haven't read anything about his custodial status, whether he's in or out?

JUROR NO. 6 . . . : No.

THE COURT: Anything of that nature?

JUROR NO. 6 . . . : No.

(R.T. 72:5-17.)

The judge then questioned JN 3 separately, and JN 3's responses evinced that the Cameron Park court facilities may have left him with the impression Coyle was in custody:

THE COURT: . . . .  [W]ere you present during some discussions [about Coyle's custody status] this morning?

Juror No. 3: Yes.

THE COURT: Alright.   Tell me about that situation, what the conversation was.

Juror No. 3 . . . : . . . [S]omeone, a woman beside me said, "Is this person, [Coyle] the Defendant, is he still incarcerated?"   And I thought, "I think so, because I saw handcuffs, a lot of them back there."   And yesterday when we had a break, we could not go in [the court]room, so I thought, "Well maybe he is incarcerated." And there was a discussion about that, whether or not he was still incarcerated. . . .   And one of the ladies who works at the Sacramento jail said, "Yes, indeed, it can take that long, and there are people that are in jail that long before they actually go to trial."

THE COURT: Okay.   So that was based on your personal observations and discussion.   You haven't read anything, for example, or seen anything as far as what [Coyle's] actual custody status was.

Juror No. 3 . . . : No, I hadn't seen anything or read anything about this case at all.

(R.T. 73:5-74:4 (emphasis added).)  JN 3 was sent back the jury room.

Defense counsel then moved for a mistrial, arguing the jury was contaminated by the discussions about Coyle's custodial status.  The prosecution conceded juror misconduct, but opposed mistrial, arguing the misconduct was not prejudicial: "In this particular case, as an officer of the court, the People would concede there has been juror misconduct. . . .  However, . . . the standard . . . is that [the misconduct was] prejudicial," and the misconduct in this case, the prosecutor argued, could be cured by "instructing [the jury] that [Coyle's custodial status is]

4

1  something that they should not consider and should not weigh in . . . their decision-making and

2  that has been deemed appropriate to kind of cure . . . the fact that the defendant is in restraints,

3  since that is sometimes necessary."  (R.T. 81:8-23 (citing Judicial Council of Cal., Criminal Jury

4  Instructions No. 204 ("Defendant Physically Restrained"); People v. Rodriguez, 8 Cal. 4th 1060,

5  1177-80 (1994) (concluding that juror misconduct in inadvertently observing defendant in

6  handcuffs during the trial was "nonprejudicial")).)

7      After lengthy argument outside the presence of the jury concerning defendant's motion for

8  mistrial, the judge called each juror into the courtroom one-at-a-time and questioned each in the

9  following manner:

10      THE COURT: . . . [A]pparently there was some discussion this
11      morning in the jury room . . . about [Coyle's] custody status.  Were
        you present when that discussion occurred?

12      Juror No. 1 . . . : Yes.

13      THE COURT: All right.  And the fact that [Coyle] is or is not in
14      custody, if I instructed you that as not something that you were to
        consider in this case, whether he is or is not in custody currently or
15      in the past, would that cause you any concern in evaluating the
        testimony in this manner, listening to all of the witnesses,
16      determining with the other jurors, deliberating with the other jurors,
        the facts of the case, applying the law and reaching a just verdict in
17      this matter?

18      Juror No. 1 . . . : No.

19  (R.T. 87:19-88:6.)  The judge repeated these questions with each juror—except AJN 1—and each

20  juror answered that he or she could apply the law fairly.  (R.T. 88:13-100:19.)  The court then

21  excused AJN 1 from the jury, explaining: "I can't figure out a way to respond to your inquiry

22  [about whether Coyle was in custody since 2003] without injecting things into the court process,

23  or the jury process, that should not and cannot be injected into the process. . . .  [B]ecause I can't

24  think of a way around it[,] . . . . I will excuse you at this time."  (R.T. 102:5-19.)

25      The court denied defendant's motion for a mistrial, concluding that the "jurors have

26  indicated that they can follow [the court's] instructions on this issue."  (R.T. 103:27-104:13.)  The

27  court gave the jury the following curative instruction, based on Judicial Council of California,

28  Criminal Jury Instructions No. 204:

> Whether or not the Defendant is currently or at any time has ever been in custody, or whether he is out of custody in this case, is not evidence.  Do not speculate as to whether the Defendant is in custody, either currently or in the past.  You must completely disregard this circumstance in deciding the issues in this case.  You are not to consider it for any purpose or discuss it during your deliberations.

(R.T. 107:18-25.)

After the instruction, the trial continued.  On the next day of trial (the third day of trial), four jurors observed Coyle detained in the courtroom during the lunch hour.  Defense counsel complained that the jury would infer Coyle was in custody from his presence in the courtroom during the lunch hour.  Accordingly, the judge decided to move the trial from Cameron Park back to the Placerville courthouse.  The trial continued, and Coyle was convicted of murder.

On direct appeal, Coyle challenged the trial court's denial of his motion for mistrial, arguing the inadequacy of the Cameron Park facilities repeatedly and prejudicially brought to the jurors' attention his custodial status; the Court of Appeal disagreed, affirming his conviction.  The court reasoned "the physical limitations of the court facility at Cameron Park fostered speculation by the jury that defendant was in custody."  Coyle, C058218, at *17.  However, the conditions did not rise to the level of "repeatedly convey[ing]" defendant's "in-custody status . . . to the jury," as required to establish a constitutional deprivation.  Id. (internal quotation marks omitted and emphasis in original) (quoting People v. Bradford, 15 Cal. 4th 1229, 1336 (1997)).  "Indeed, to ensure that it was not [a constitutional deprivation], the trial court arranged for the trial to be moved back to the main courthouse in Placerville."  Id.  Moreover, in light of the trial court's curative instruction, the Court of Appeal concluded Coyle was not prejudiced by the juror misconduct.  Id. at *18-19.

B.  Juror Number 11's Actual Bias

On the second day of trial, the judge received a note from Juror Number 11 ("JN 11") during the lunch recess, which petitioner contends—together with the discussion that followed—evinces JN 11 was actually biased.  The note expressed JN 11's concerns about juror information questionnaires: "Judge, I'm concerned about the security of the personal information provided in the juror questionnaire.  Could the Court collect and destroy or retain all copies on a need-to-

6

1   know basis?"  (R.T. 222:9-13.)  Outside the presence of the jury, the judge disclosed the contents

2   of the note, and he told the parties that he would instruct the jurors that the questionnaires would

3   be collected and destroyed at the end of the trial; however, this was insufficient for the defense.

4         The defense asked the court to question JN 11 about the note, explaining: "[T]here was an

5   article in the paper last Thursday . . . [and] the article starts talking about the safety concerns as if

6   Coyle is the dangerous person. . . .  I don't think that's what we want to convey to the jury, and

7   I'm a little bit concerned about that."  (R.T. 225:13-22.)  The court agreed and asked JN 11

8   individually what "triggered" his concern.  JN 11 responded: "The defendant was looking through

9   [the questionnaires], among other things. . . .  I worked a little in this field and had some bad

10  experiences."  (R.T. 228:18-27.)  The judge asked, "Okay.  [You] [d]idn't like, see an article in

11  the newspaper or anything like that that caused any additional concern or anything?"  (R.T.

12  228:28-229:2.)  JN 11 responded, "No."

13        Without objection from defense counsel, the judge called the rest of the jurors into the

14  courtroom and explained that the juror-information questionnaires would be collected and

15  destroyed: "The Court keeps the originals of all the questionnaires. . . . I collect all copies at the

16  conclusion of the trial and destroy the copies and keep the originals."  (R.T. 230:12-20.)  The

17  judge then explained that the next day, the trial would be moving from Cameron Park to the main

18  Placerville courthouse.

19        On direct appeal, Coyle argued his conviction should be reversed because JN 11's

20  comments revealed actual bias, and the trial court failed to follow up, clarify, and address JN 11's

21  comments.  The Court of Appeal disagreed and affirmed, reasoning Coyle's "arguments fail to

22  place JN11's comments in their appropriate context.  JN11's note expressed concern about the

23  security of juror personal information on the juror questionnaires," and "[i]t was in this context ...

24  that JN11 explained he/she had had 'some bad experiences.'"  Coyle, C058218, at *21.  The court

25  concluded that "the note . . . focuses exclusively on the disposition of the questionnaires," which

26  "suggests a possible concern about identify theft, not defendant's dangerousness," and held "[w]e

27  find no error in the trial court's handling of the matter."  Id. at 22.

28  /////

7

II. <u>Standard for Habeas Corpus Relief</u>

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  Also, federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)."[1]  It is the habeas petitioner's burden to show he is not precluded from obtaining relief by § 2254(d).  See <u>Woodford v. Visciotti</u>, 537 U.S. 19, 25 (2002).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different. As the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in <u>Williams</u> [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

<u>Bell v. Cone</u>, 535 U.S. 685, 694 (2002).  A state court does not apply a rule different from the law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply fails to cite or fails to indicate an awareness of federal law.  <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002).

The court will look to the last reasoned state court decision in determining whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases

---

[1] Title 28 U.S.C. § 2254(d) establishes a precondition to federal habeas relief, not grounds for entitlement to habeas relief.  <u>Fry v. Pliler</u>, 551 U.S. 112, 119 (2007).

1   of the United States Supreme Court or whether an unreasonable application of such law has

2   occurred.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).

3         When a state court rejects a federal claim without addressing the claim, a federal court

4   presumes the claim was adjudicated on the merits, in which case § 2254(d) deference is

5   applicable.  Johnson v. Williams, 133 S. Ct. 1088, 1096 (2013).  This presumption can be

6   rebutted.  Id.

7         It is appropriate to look to lower federal court decisions to determine what law has been

8   "clearly established" by the Supreme Court and the reasonableness of a particular application of

9   that law.  "Clearly established" federal law is that which has been determined by the Supreme

10  Court.  Arredondo v. Ortiz, 365 F.3d 778, 782-83 (9th Cir. 2004).  At the same time, it is

11  appropriate to look to lower federal court decisions as persuasive authority in determining what

12  law has been "clearly established" and the reasonableness of a particular application of that law.

13  Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999); Clark v. Murphy, 331 F.3d 1062 (9th

14  Cir. 2003), overruled on other grounds by Lockyer v. Andrade, 538 U.S. 63 (2003); cf.

15  Arredondo, 365 F.3d at 782-83 (noting that reliance on Ninth Circuit or other authority outside

16  bounds of Supreme Court precedent is misplaced).

17        As discussed above, both of the claims presented in this action were presented on direct

18  appeal.  The California Court of Appeal issued a reasoned decision with respect to both of

19  petitioner's claims.  The claims were presented to the California Supreme Court via a "petition

20  for review."  Both claims were denied without comment.

21  III.  Arguments and Analysis

22        Petitioner Coyle challenges his criminal conviction, arguing  the trial court's refusal to

23  declare a mistrial deprived him of his right to a fair trial on two grounds: (a) the courthouse

24  arrangement prejudicially left jurors with the impression petitioner was in custody during his trial,

25  and (b) Juror Number 11 ("JN 11") was actually biased.  The Sixth and Fourteenth Amendments

26  guarantee criminal defendants the right to have "guilt or innocence determined solely on the basis

27  of the evidence introduced at trial, and not on grounds of official suspicion, indictment, or other

28  circumstances not adduced as proof at trial."  Holbrook v. Flynn, 475 U.S. 560, 567 (1986)

9

1    (internal quotation marks omitted) (quoting <u>Taylor v. Kentucky</u>, 436 U.S. 478, 485 (1978)).

2    Moreover, "[t]he Sixth Amendment guarantees criminal defendants a verdict by an impartial

3    jury." <u>United States v. Gonzalez</u>, 214 F.3d 1109, 1111 (9th Cir. 2000).  In the last reasoned

4    decision, the Court of Appeal of the State of California for the Third District considered these

5    issues, and held that the trial court did not err in denying petitioner's motions for a mistrial.

6    <u>Coyle</u>, No. C058218, at *12-22.  For the reasons stated below, the undersigned finds the Court of

7    Appeal's decision was not "contrary to, or involved an unreasonable application of, clearly

8    established federal law," 28 U.S.C. § 2254(d), and will recommend Coyle's petition be denied.

9               A.  <u>The Prejudicial Effect of the Courtroom</u>

10           Petitioner argues that the courtroom arrangements at the Cameron Park courthouse left

11   jurors with the impression he was in custody in violation of his Sixth and Fourteenth Amendment

12   rights to trial by impartial jury.  (<u>See</u> First Amended Pet for Writ of Habeas Corpus ("Pet.")19-22,

13   ECF No. 27.)  A criminal defendant is deprived of his constitutional right to trial by impartial jury

14   if courtroom arrangements are "so inherently prejudicial as to pose an unacceptable threat to

15   defendant's right to a fair trial." <u>Flynn</u>, 475 U.S. at 568-69; <u>accord</u> <u>Estelle v. Williams</u>, 425 U.S.

16   501, 504 (1976); <u>Carey v. Musladin</u>, 549 U.S. 70, 80 (2005) (Kennedy, J., concurring) ("The rule

17   settled by [the Supreme Court] requires a court, on either direct or collateral review, to order a

18   new trial when a defendant shows his conviction has been obtained in a trial tainted by an

19   atmosphere of coercion or intimidation . . . ." (collecting cases)).  "All a federal court may do" in

20   reviewing a constitutional challenge to a state court proceeding "is look at the scene presented to

21   jurors and determine whether what they saw was . . . inherently prejudicial . . . ; if the challenged

22   practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the

23   inquiry is over." <u>Flynn</u>, 475 U.S. at 572.

24           Courtroom arrangements that amount to a "constant reminder" of the "need to separate a

25   defendant from the community at large"—such as compelling the defendant to appear at "trial in

26   prison or jail clothing"—are inherently prejudicial "because of the possible impairment of the

27   presumption [of innocence] so basic to the adversary system." <u>Estelle v. Williams</u>, 425 U.S. at

28   504; <u>Flynn</u>, 475 U.S. at 569.  However, courtroom arrangements that give rise only to the

1    reasonable inference that a defendant is "particularly dangerous or culpable"—such as the

2    "deployment of security personnel in a courtroom during a trial"—are not inherently prejudicial.

3    Flynn, 475 U.S. at 568-69, 572.

4            For example, in Flynn, four uniformed and visibly armed state troopers sat directly behind

5    the defendants throughout their criminal trial.  At trial, the defendants did not object to "the use of

6    . . . plainclothed security personnel," but argued "the presence of uniformed officers would

7    suggest to the jury that defendants were 'of bad character.'"  Id. at 562-63.  On appeal, the

8    Supreme Court affirmed their convictions, and held that this courtroom arrangement was not

9    inherently prejudicial.  Id. at 568-71.  The Court reasoned the presence of state troopers "need not

10   be interpreted as a sign [the defendant] is particularly dangerous or culpable."  Id. at 569.  Even

11   though the Court conceded this interpretation is within the "wider range of inferences that a juror

12   might reasonably draw from the officers' presence," the Court explained jurors "may just as

13   easily believe that the officers are there to guard against disruptions . . . from outside the

14   courtroom" or to manage "tense courtroom exchanges."  Id.  In contrast, the defendant in Estelle

15   v. Williams requested, and was denied, access to his civilian clothes for trial, forcing him to

16   appear in prison attire.  425 U.S. at 502.  The Supreme Court held that compelling the defendant

17   to appear in prison attire was inherently prejudicial.  The Court reasoned that the prison attire is a

18   "constant reminder of the accused's condition," and "is so likely to be a continuing influence

19   throughout the trial that . . . an unacceptable risk is presented of impermissible factors" affecting

20   "a juror's judgment."  Id. at 504-05 (citing Turner v. Louisiana, 379 U.S. 466, 473 (1965)). [2]

21           Petitioner argues the courtroom arrangements in his trial were inherently prejudicial.

22   Specifically, Coyle points out that AJN 1 was excused because the trial court could not assure

23   AJN 1 that Coyle had not been in custody, and Coyle argues the remaining jurors would have

24   concluded from AJN 1's dismissal that Coyle had been in custody since the murder in 2003.

25   (Pet.19.)  Considered together with JN 3's observation of handcuffs in the courtroom and the four

26   _____

     [2] Ultimately, the Court affirmed the conviction, holding that "although the State cannot …
27   compel an accused to stand trial before a jury while dressed in identifiable prison clothes," the
     defendant waived the constitutional violation because he "fail[ed] to make an objection to the
28   court."  Estelle v. Williams, 425 U.S. at 512-13.

1   jurors' observation that Coyle was detained in the courtroom during the lunch hour, (Pet. 15-16),

2   petitioner argues the scene presented to the jurors was inherently prejudicial.  (Pet. 22.)

3   Moreover, petitioner argues he was actually prejudiced, as evinced by the following testimony

4   from Juror Number 3:

> [S]omeone, a woman beside me said, "Is this person, [Coyle] the Defendant, is he still incarcerated?"  And I thought, "<u>I think so, because I saw handcuffs, a lot of them back there.</u>"  And <u>yesterday when we had a break, we could not go in [the court]room so I thought, "Well maybe he is incarcerated.</u>"  And there was a discussion about that, whether or not he was still incarcerated. . .

9   (R.T. 73:5-74:4 (emphasis added); Pet. 16.)

10        Respondent counters arguing the U.S. Supreme Court has never "addressed the precise

11   issue raised here: whether a jury's inadvertent receipt of information regarding defendant's

12   custody status can result in an unfair trial."  (Answer Pet. Writ of Habeas Corpus ("Answer")

13   17:13-19, ECF No. 29.)  Respondent argues that the standard articulated by the Supreme Court in

14   <u>Flynn</u> is general, affording the Court of Appeal's decision in this case "great leeway in applying

15   it."  (<u>Id.</u> at 18:3-4 (citing <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004) ("The more general

16   the rule, the more leeway courts have in reaching outcomes in case-by-case determination.").)

17   Moreover, respondent argues the Court of Appeal's decision reasonably applied <u>Flynn</u>, because

18   jurors "only speculated" that Coyle "might be" in custody, the "only outside information jurors

19   received about [Coyle's] possible custody status was the sight of handcuffs," and the Court of

20   Appeal "reasonably concluded the trial court's instruction cured any possible prejudice."  (<u>Id.</u> at

21   18:7-26.)

22        Here, this court finds that the proceedings at the Cameron Park courthouse did not amount

23   to a "constant reminder" of the "need to separate a defendant from the community at large," but,

24   at most, gave rise to the inference that the defendant was in custody.  <u>Estelle v. Williams</u>, 425

25   U.S. at 504; <u>Flynn</u>, 475 U.S. at 569.  Unlike <u>Estelle v. Williams</u> in which the entire jury was

26   constantly reminded of the defendant's custodial status by his prison garb, at Coyle's criminal

27   trial some of the jurors were occasionally exposed to facts supporting the inference that Coyle

28   was in custody.  These sporadic instances—the appearance of handcuffs and the presence of

1  police officers in the courtroom, four jurors observing Coyle detained during lunch, and the

2  inaccessibility of the courtroom during lunch breaks—may have given rise to the reasonable

3  inference that Coyle was in custody.   But these scattered events were not "so inherently

4  prejudicial as to pose an unacceptable threat to defendant's right to a fair trial."   Flynn, 475 U.S.

5  at 568.   Moreover, after his defense attorney complained, Coyle's trial was relocated to the

6  Placerville courthouse; thus, unlike the prison clothes the defendant in Estelle v. Williams was

7  forced to wear throughout his trial, the prejudicial effect in petitioner's trial was limited in

8  duration.

9         Further, petitioner's argument that the only "conclusion" that the "remaining jurors could

10  ... have drawn" from Alternate Juror 1's dismissal is that the defendant had been in custody, (Pet.

11  19), is unavailing, because the jury could have reasonably reached the opposite conclusion.   The

12  record shows that AJN 1 was concerned that she had contact with the defendant recently,

13  provided that he had not been in custody—which would disqualify her from the jury—a concern

14  she expressed to her fellow jurors.   As in Flynn, the "[j]urors may just as easily [have] believe[d]"

15  AJN 1 was dismissed because she had in fact seen Coyle recently at work; therefore, the jurors

16  may have concluded from AJN 1's dismissal that Coyle had not been in custody for the past

17  several years.   475 U.S. at 569.

18         Moreover, this court finds the Court of Appeal's conclusion—that any actual prejudice

19  was cured by the trial court's jury instruction—was not unreasonable.   As soon as the trial court

20  learned jurors were discussing Coyle's custodial status, the judge promptly questioned each juror

21  about it.   Each juror separately stated that he or she could follow an instruction not to consider the

22  defendant's custodial status.   The judge instructed the jury that Coyle's custodial status was not

23  evidence and to "disregard this circumstance in deciding the issues in this case."   (R.T. 107:18-

24  25.)   Accordingly, "[a]ny impression that the jury may have had that it could consider [Coyle's

25  custodial status] was specifically and timely corrected by the trial judge."   Dubria v. Smith, 224

26  F.3d 995, 1002 (9th Cir. 2000).   Since, "a cautionary instruction is presumed to have cured

27  prejudicial impact," id., this court finds that the Court of Appeal's holding—that any prejudice

28  was cured by the judge's instruction—was not "contrary to, or involved an unreasonable

13

1   application of, clearly established federal law." 28 U.S.C. § 2254(d)(1).

2       Therefore, the undersigned recommends that petitioner's claim that the Cameron Park

3   courthouse facilities prejudicially left jurors with the impression he was in custody be denied.

4       B.  Juror Number 11's Actual Bias

5       Petitioner argues Juror Number 11 was actually biased, as evinced by JN 11's note

6   expressing concerns about the security of information provided in the juror questionnaires.  (Pet.

7   22-23.)  "The bias or prejudice of even a single juror is enough to violate" the Sixth Amendment

8   guarantee of an impartial jury, and the "presence of a biased juror . . . requires a new trial without

9   a showing of actual prejudice."  United States v. Gonzalez, 214 F.3d 1109, 1111 (9th Cir. 2000)

10  (internal quotation marks omitted) (quoting Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir. 1998)).

11  "Actual bias is, in essence, 'bias in fact'—the existence of a state of mind that leads to an

12  inference that the person will not act with entire impartiality."  United States v. Olsen, 704 F.3d

13  1172, 1189 (9th Cir. 2013).  "Actual bias is typically found when a prospective juror states that he

14  cannot be impartial, or expresses a view adverse to one party's position and responds equivocally

15  as to whether he could be fair and impartial despite that view."  Fields v. Brown, 503 F.3d 755,

16  767 (9th Cir. 2007) (en banc).

17      Petitioner contends JN 11's note to the judge evinced concerns about "personal safety"

18  (Pet. 22), and that the following statement reveals actual bias: "I worked a little in this field and

19  had some bad experiences."  (R.T. 228:18-27.)  Respondent counters "nothing in the record

20  indicates that JN11 was biased against Petitioner."  (Answer 20:12-13.)

21      Here, as the Court of Appeal concluded, the note and subsequent comment—considered in

22  context—evince concerns about personal privacy, not safety.  JN 11's note stated: "Judge, I'm

23  concerned about the security of the personal information provided in the juror questionnaire.

24  Could the Court collect and destroy or retain all copies on a need-to-know basis?"  (R.T. 222:9-

25  13.)  Then, in response to defense counsel's request, the trial court questioned JN 11 about the

26  source of that concern.  The judge asked: "I was just curious if something had triggered your

27  concern or what caused this question to come up, anything in particular or just in general?"  (R.T.

28  228:18-20.)  JN 11 responded: "The defendant was looking through [the questionnaires], among

14

1   other things. . . .  I worked a little in this field and had some bad experiences."  (R.T. 228:18-27.)

2   The judge asked, "Okay.  [You] [d]idn't like, see an article in the newspaper or anything like that

3   that caused any additional concern or anything?"  (R.T. 228:28-229:2.)  JN 11 responded, "No."

4   Considered in this context, the Court of Appeal reasonably interpreted JN 11's comments to mean

5   that his or her "bad experiences" were related to "identity theft, not defendant's dangerousness."

6   Coyle, C058218, at *22.  Moreover, at no point did JN 11state that he or she "could not be

7   impartial when evaluating . . . testimony," "emphasize[] . . . negative experiences" associated

8   with Coyle or his case, or "respond[] equivocally when asked if he [or she] could render a fair and

9   impartial verdict . . . ."  Gonzalez, 214 F.3d at 1112.

10          Therefore, this court cannot conclude the Court of Appeal's decision, finding no error in

11   the trial court's handling of JN 11's note, amounted to "an unreasonable determination of the

12   facts in light of the evidence presented."  28 U.S.C. § 2254(d)(2); see also Olsen, 704 F.3d at

13   1189 ("The determination of whether a juror is actually biased is a question of fact . . . ." (internal

14   quotation marks omitted)).  Finding the Court of Appeal's decision supported by the evidence,

15   this court recommends this portion of the petition be denied.

16   IV.  Conclusion

17          Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

18   habeas corpus be DENIED.

19          These findings and recommendations are submitted to the United States District Judge

20   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

21   after being served with these findings and recommendations, any party may file written

22   objections with the court and serve a copy on all parties.  Such a document should be captioned

23   "Objections to Magistrate Judge's Findings and Recommendations."  In his objections petitioner

24   may address whether a certificate of appealability should issue in the event he files an appeal of

25   the judgment in this case.  See Rule 11, Federal Rules Governing Section 2254 Cases (the district

26   court must issue or deny a certificate of appealability when it enters a final order adverse to the

27   applicant).  Any reply to the objections shall be served and filed within fourteen days after service

28   of the objections.  The parties are advised that failure to file objections within the specified time

1  may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th

2  Cir. 1991).

3  Dated:  July 19, 2013

4  _____
   CAROLYN K. DELANEY

5  UNITED STATES MAGISTRATE JUDGE

6  GP
   Coyl.0016.HC

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28